UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>SEELOS THERAPEUTICS, INC.[1]<br><br>Debtor | Chapter 11<br><br>Case No. 24-11987 (JPM) |

SUPPLEMENTAL DECLARATION OF RAJ MEHRA, PH.D.
IN SUPPORT OF DEBTOR'S MOTION DEBTOR'S MOTION FOR ENTRY OF
ORDER PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE (I)
AUTHORIZING THE PRIVATE SALE OF CERTAIN OF DEBTOR'S ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS,
AND (II) GRANTING RELATED RELIEF

I, Raj Mehra, Ph.D., do hereby declare under penalty of perjury:

1. I am the Chief Executive Officer of Seelos Therapeutics, Inc. ("Seelos" or "Debtor").

2. Except as otherwise indicated, all facts set forth in this Supplemental Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management team and employees, and the Debtor's other advisors, my review of relevant documents and information concerning the Debtor's operations and financial affairs, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Supplemental Declaration on that basis. I am over the age of 18 years and authorized to submit this Supplemental Declaration on behalf of the Debtor.

1

3. Debtor filed a voluntary petition for relief under Chapter 11 (the "Chapter 11 Case") of the Bankruptcy Code on November 15, 2024 ("Petition Date").

4. Debtor is a clinical-stage biopharmaceutical company focused on achieving efficient development of products that address significant unmet needs in Central Nervous System ("CNS") disorders and other rare disorders.

5. Debtor's business model is to advance multiple late-stage therapeutic candidates with proven mechanisms of action that address large markets with unmet medical needs and for which there is a strong economic and scientific rationale for development.

6. Debtor is a publicly traded company. Prior to the Petition Date, the Debtor's common equity was listed on NASDAQ. At present, the Debtor's common equity is traded on the OTC Markets.

7. Debtor's focus on growth exceeded its ability to sustainably fund that growth and found itself unable to keep pace with its working capital requirements. Historically, Debtor relied on the public securities markets to raise capital – either through sales of its stock or the issuance of convertible promissory notes.

8. Recent changes in market appetite for biotech companies have rendered the Debtor unable to raise new funds from the public securities markets. Additionally, private markets for capital have also turned away from biotech offerings. As a result of its inability to raise fresh capital, Debtor had to seek bankruptcy protection to find a sustainable path forward.

9. The Debtor's principal pre-petition secured debt obligation is a

Convertible Promissory Note, as amended (the "Lind Note"), dated November 23, 2021, issued by Debtor in favor of Lind Global Asset Management V, LLC ("Lind") in the original principal amount of $22,000,000. The Debtor's obligations under the Lind Note were secured by a first lien on all assets of the Debtor as reflected in that certain Security Agreement effective November 23, 2021 (the "Security Agreement") and that certain Patent Security Agreement effective November 23, 2021 (the "Patent Security Agreement") and is perfected by the filing of a UCC Financing Statement, UCC 1, with the Nevada Secretary of State on November 23, 2021 (the Security Agreement, Patent Security Agreement and the Lind Note are collectively referred to as the "Pre-Petition Loan Debt").

10. On February 5, 2025, the Pre-Petition Loan Debt was assigned by Lind to GLD Debt Acquisition 2025-1, Inc. ("Secured Lender").

11. As of February 5, 2025, the outstanding principal and interest balance owed to Secured Lender on account of the Pre-Petition Loan Debt was no less than $9,000,000.

### The Debtor's Continuing Post-Petition Marketing Efforts

12. As more fully set forth in declarant's declaration, dated April 28, 2025 ("Sale Declaration"), and submitted in support of the instant motion [*ECF* no. 38], notwithstanding a challenging economic atmosphere in the Debtor's technological space, Debtor undertook, and continues, a robust, and wide-ranging marketing efforts for some or a portion of its assets. (Sale Declaration, ¶¶s 13-17). Therefore, I restate and reiterate all points set forth in the Sale Declaration

in its entirety, and supplement same herein as follows.

13. As part of the Marketing and Sale Process, post-petition, Debtor actively engaged with potential bidders and investment bankers including signing 4 NDAs with potential bidders (one of the potential bidders was referred by the creditors' committee counsel). Of the 4 potential bidders, only one of them provided a term sheet for three assets (SLS-006, SLS-009 and SLS-010) for $150,000 upfront cash upon closing. Debtor has provided all the information on its assets to the bidders through slide presentations, hosting specific Q&A sessions and generally made himself available to the bidders but has not receive any bids other than the one mentioned above. The investment bankers outlined the prevailing challenging environment for equity raise and did not provide any concrete interested party.

14. Based on my involvement in the marketing and sale process for the Sale Assets – both pre-petition and post-petition, I believe that the Debtor had reasonable opportunity to solicit, negotiate, and evaluate the bids for the Sale Assets, and afforded interested parties a reasonable opportunity to conduct due diligence. Moreover, I believe that the marketing and sale process conducted by the Debtor was comprehensive, transparent, and was conducted in good faith.

15. Based on the extensive marketing efforts described above and my experience, I believe that the Asset Sale reflected in the Asset Purchase Agreement represents the highest or otherwise best offers for the Sale Assets

currently available to the Debtor under the circumstances of the Chapter 11 Case. Additionally, based upon my observations during the marketing and sale process, I believe the Debtor entered into the Asset Purchase Agreement with Secured Lender in good faith and without collusion or fraud. Based on my observations, knowledge, and interactions during the marketing and sale process, I believe that Secured Lender has transacted with the Debtor in good faith throughout this process.

## Conclusion

16. Accordingly, for all the foregoing reasons and those previously set forth in the Sale Declaration, I submit that (a) the Debtor engaged in a robust and thorough marketing and sale process; (b) the terms of the Asset Purchase Agreement, taken as a whole, reflect the highest or otherwise best offer for the Sale Assets currently available under the circumstances of the Chapter 11 Case; and (c) entry into the Asset Purchase Agreement is in the best interest of the Debtor's estate. Accordingly, and given the details described above and based on my experience, I believe that the Court should enter the Sale Order and approve the Asset Sale on the terms and conditions set forth in the Asset Purchase Agreements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information, and belief.

Dated: June 2, 2025     /s/ Raj Mehra
Raj Mehra, Ph.D.
Chief Executive Officer

1. The last four digits of the Debtor's federal tax identification number is 9967.